## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| HEARTLAND CERAMIC APPLICATIONS, INC., | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 15-CV-242-TCK-PJC ) |
| PRO-TEK-USA, LLC; WESTERN COLLOID N.C., INC., | ) ) ) |
| Defendants. | ) ) |

### OPINION AND ORDER

Before the Court is the Motion for Summary Judgment of Defendant Western Colloid N.C., Inc. ("Western Colloid") (Doc. 41). Western Colloid moves for summary judgment as to all claims asserted against it pursuant to Federal Rule of Civil Procedure 56.

### I.   Factual Background[1]

The relevant events in this case occurred over eight years ago. Plaintiff failed to effect timely service upon Defendant Pro-Tek-USA ("Pro-Tek") and demonstrated an extreme lack of diligence in failing to do so. The Court therefore dismissed the claims against Pro-Tek with prejudice. *Heartland Ceramic Applications, Inc. v. Pro-tek-USA, LLC*, No. 15-CV-242-TCK-PJC, 2016 WL 447498, at *1 (N.D. Okla. Feb. 4, 2016). Plaintiff served Western Colloid within the extension period granted in state court prior to removal. *Id.* Therefore, the Court permitted the case to proceed against Western Colloid.

---

[1] A more detailed procedural history of this case is set forth in *Heartland Ceramic Applications, Inc. v. Pro-tek-USA, LLC*, No. 15-CV-242-TCK-PJC, 2016 WL 447498, at *1 (N.D. Okla. Feb. 4, 2016).

The following facts in the summary judgment record are either undisputed or viewed most favorably to Plaintiff Heartland Ceramics Corporation ("Heartland"). Robbie Williamson ("Williamson") is the owner and operator of Heartland. At relevant times, Heartland marketed and sold the service of applying "ceramic coating" to the outside of homes or businesses. Heartland marketed its ceramic coating as superior and longer lasting than ordinary paint. Heartland's ceramic coating service involved a three-step process: (1) applying primer; (2) applying a coat of ceramic coating; and (3) applying a second coat of ceramic coating. The Court refers to the primer and coating generically as the "product." Heartland hired independent contractors to apply the product, but Williamson was also regularly present at job sites. At relevant times, an independent contractor named Bart Thomison ("Thomison") was the primary person applying the product to customers' homes and businesses for Heartland.

From 2002 until around 2005, Heartland purchased the product from Insulated Coating Corporation ("ICC"). Heartland had no problems with the ICC product. During this time, Heartland earned a good reputation and "A" rating with the Better Business Bureau ("BBB"). At certain times while Heartland was prospering, Williamson earned over $400,000 per year and Thomison earned over $90,000 per year.

Around 2005, ICC stopped offering a 25-year warranty on the product. Williamson believed the warranty helped him market his service and therefore started shopping for an alternative product. He contacted a company he refers to as Nationwide. Although Nationwide would not sell the product directly to Heartland, a Nationwide representative told Williamson that a person from Pro-Tek, a company in Seattle, Washington, would contact Williamson. As promised, Bert Lerch ("Lerch") of Pro-Tek contacted Williamson. Heartland began purchasing the product from Pro-Tek.

At first, the Pro-Tek product was being manufactured by Nationwide. At some point, Nationwide informed Pro-Tek that Pro-Tek could no longer re-sell Nationwide's product to Heartland (even under the Pro-Tek name). According to Williamson, Nationwide had a larger customer known as Rhino Shield that was demanding Nationwide cease supplying product to Heartland through Pro-Tek. Lerch told Williamson he would find another manufacturer of the product, and he did. Williamson did not inquire or discover who the new manufacturer was until he started having problems in 2008. Regardless of the manufacturer, the product always arrived in buckets with "Pro-Tek" labels, and Heartland thought of the product as "Pro-Tek" product.

Sometime around 2008, Williamson noticed a change in the consistency of the primer as "not near as sticky" and having "clumps and clots in it." (Williamson Dep. 39:13-20.) Thomison stated that "normally it was a thick, paste-like primer" but the different primer was "thin" and "super sticky." (Thomison Dep. 39:16-24.) According to Williamson, this primer sometimes needed strained with a cheese cloth before it could be sprayed. Upon first opening buckets of the primer that appeared different, Williamson immediately called Lerch. Lerch said there was nothing wrong with the product and that he would guarantee it. Williamson used the allegedly defective primer on numerous homes in the 2008-2009 time frame.

During this time, customers began complaining about "bubbling" and "warping" on their houses. Originally, Williamson and Thomison were not sure what was causing the bubbling. They speculated they were themselves causing the bubbling by placing the product on wet or rotted wood. But while attempting to fix customers' problems, they became convinced that the primer was the source of the problem. They worked on houses where the wood was new and dry but still had bubbling. They worked on houses where the shutters and siding had the same primer and different

3

coatings, but both surfaces still had bubbling. They also formed the opinion as to how the primer was causing the bubbling -- namely, by overheating and "melting" in the sun, causing the primer to move away and form a bubble. They formed this opinion, in part, because areas of homes that were shaded did not bubble, while areas in direct sun did.

Heartland spent over $30,000 attempting to fix bubbling on dozens of homes. Many customers were never satisfied with their end result, and Williamson claims that Heartland's BBB rating went from an "A" to an "F" due to his inability to remedy problems caused by the primer. The record contains pictures of various houses and names of specific customers who complained. Williamson eventually stopped addressing customers' problems when he realized he would not receive any reimbursement from Pro-Tek or Western Colloid.

During this time frame, Williamson repeatedly complained to Lerch about the product and requested that Pro-Tek help pay for the repairs. Williamson also learned that Western Colloid was manufacturing the product. At one point, Williamson asked Lerch to come to Tulsa and bring a Western Colloid representative so they could observe the bubbling problem, but they refused to do so. Williamson did not have contact information for Western Colloid and did not view that company as his vendor. He nonetheless contacted Western Colloid once or twice and spoke with one individual there. During his deposition, Williamson described Lerch as the "bad apple" of the situation, and it is clear that Williamson feels most aggrieved by Lerch who expressly warranted the Pro-Tek product to him. Thus, evidence reflects that Williamson provided notice of the alleged problems to Pro-Tek and Western Colloid.

At some point, Williamson and Thomison believed they received a primer that resembled the better, thicker version of the primer. According to Williamson, he immediately called a Pro-Tek

4

employee named Maria, who admitted that Pro-Tek ceased using Western Colloid and started using Nationwide as the manufacturer of the product. Heartland continued applying ceramic coatings until 2014, but its ceramic coating business never recovered from the period of time when it had a high rate of customer dissatisfaction.

In the FAC, Heartland asserts the following claims against Western Colloid: (1) breach of express warranty; (2) beach of warranty of fitness for a particular purpose; and (3) breach of implied warranty of merchantability. (FAC ¶ 16.) Western Colloid moved for summary judgment on all claims.[2]

## II.   Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006). The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Id*. However, the party seeking to overcome a motion for summary judgment may not "rest on mere allegations" in its complaint but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party seeking to overcome a motion for summary judgment must also make a showing sufficient to establish the existence of those elements essential to that party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-33 (1986).

---

[2] Western Colloid also moved for summary judgment on a claim arising under the Oklahoma Consumer Protection Act ("OCPA"), and Heartland responded to this argument. However, the Court has carefully reviewed the FAC and finds that Heartland only asserted the OCPA claim against Pro-Tek. The Court finds no ambiguity in the FAC and finds no reason to address the merits of a claim that was not properly or timely asserted against Western Colloid.

### III. Preliminary Issues

#### A. Western Colloid's Status as Manufacturer

Western Colloid argues that it is entitled to summary judgment because Heartland cannot establish that it manufactured the product in question. However, Plaintiff's evidence is sufficient to create a question of fact. Williamson's testimony establishes his good-faith belief that Western Colloid was manufacturing the primer when bubbling occurred and when Heartland expended money repairing or attempting to repair its customers' problems. Williamson's testimony is bolstered by: (1) documents produced by Western Colloid that specifically discuss the "bubble problems" on Heartland jobs (*see* Western Colloid 028-031, Ex. 2 to Pl.'s Supp. Resp.); and (2) documents entitled "Heartland Ceramics' Project with Bubble Problems," which list the customer name and address, describe the bubbling, and include pictures (*see* Western Colloid 032-055, Ex. 2 to Pl.'s Supp. Resp.). There is also correspondence between Pro-Tek and Western Colloid during relevant times regarding Heartland's specific problems. While Western Colloid may certainly dispute whether it actually made the product at relevant times, Heartland has created genuine questions of fact as to this issue.

#### B. Agency Relationship

For purposes of all three claims, Heartland seeks to hold Western Colloid liable for the actions of Lerch/Pro-Tek under an agency theory. "An agency relationship generally exists if two parties agree that one is to act for the other." *Garrison v. Bechtel Corp.*, 889 P.2d 273, 283 (Okla. 1995). "An essential element of an agency relationship is that the principal have some degree of control over the conduct and activities of the agent." *Id.*

Heartland cannot demonstrate that Pro-Tek was acting as an agent of Western Colloid. There is no evidence of an agreement between Western Colloid and Pro-Tek that Pro-Tek would act on its behalf for any purpose. Nor is there evidence that Western Colloid exercised any control of Pro-Tek. Western Colloid made the product and sold the product to Pro-Tek. Pro-Tek re-labeled the product and sold it to Heartland. Heartland was not even aware that Western Colloid was the manufacturer of the product until problems arose. There was no actual agency or apparent agency between Pro-Tek and Western Colloid.

### C. Joint Venture

For purposes of all three claims, Heartland also seeks to hold Western Colloid liable for the actions of Lerch/Pro-Tek under a joint venture theory. "A joint venture is generally a relationship analogous to, but not identical with, a partnership, and is often defined as an association of two or more persons to carry out a single business enterprise with the objective of realizing a profit." *King v. Modern Music Co.*, 33 P.3d 947, 955 (Okla. Civ. App. 2001). "The essential criteria for ascertaining the existence of a joint venture relationship are: (1) joint interest in property, (2) an express or implied agreement to share profits and losses of the venture and (3) action or conduct showing cooperation in the project." *Id.*

There is no evidence of a joint venture between Pro-Tek and Western Colloid. They did not have any joint interest in property, they did not share property, and they did not cooperate in selling the product. Instead, Western Colloid simply made the product and sold the product to Pro-Tek. Western Colloid realized its profit upon the sale to Pro-Tek, and Western Colloid played no role in selling the product to Heartland. These are two entirely separate entities that do not satisfy the

elements of a joint venture as a matter of law. Accordingly, in analyzing the claims, the Court considers only the conduct of Western Colloid itself and not the conduct of Lerch/Pro-Tek.

## IV. Analysis of Claims

### A. Breach of Express Warranty

"Express warranties relate to the conformity of goods and consider their quality, character or condition." *Scheirman v. Coulter*, 624 P.2d 70, 72 (Okla. 1980). "In order for an express warranty to exist, there must be an absolute assertion understood by the parties pertaining to the merchandise sold." *Id.*

Plaintiff has failed to create a question of fact as to whether any individual at Western Colloid made an "absolute assertion" to Williamson regarding the product. Although Williamson may have spoken to one person at Western Colloid on one or two occasions regarding the problems he was experiencing, Williamson did not recall the specifics of this conversation or with whom he spoke. In addition, nothing in the record indicates that Western Colloid made any express warranties to Williamson regarding the quality, character, or condition of the product.

The express warranties in the record are all on Pro-Tek letterhead. Further, Williamson's testimony is clear that Lerch was the individual who warranted the product and told Williamson it would be identical to the ICC product. The Court has already rejected Heartland's agency and joint venture theories, and there is no basis to hold Western Colloid liable for express warranties made by Lerch to Heartland. Therefore, Western Colloid's motion for summary judgment is granted as to this claim.

### B. Breach of Warranty of Fitness for Particular Purpose

The Oklahoma Uniform Commercial Code ("OUCC") provides:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is[,] unless excluded or modified under the next section[,] an implied warranty that the goods shall be fit for such purpose.

Okla. Stat. tit. 12A, § 2-315.2. "A 'particular purpose' differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question." *Id.* cmt. 2.

Assuming other elements could be satisfied, this claim fails because Heartland was not using the product for a particular purpose that "differed" from the ordinary use of the product. Heartland was using or attempting to use the primer precisely for what it was intended -- namely, to adhere ceramic coating to surfaces. Therefore, Western Colloid's motion for summary judgment is granted as to this claim.

### C. Breach of Implied Warranty of Merchantability

The OUCC provides:

> (1) Unless excluded or modified (Section 2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. . . .
>
> (2) Goods to be merchantable must be at least such as
> (a) pass without objection in the trade under the contract description; and
> (b) in the case of fungible goods, are of fair average quality within the description; and
> (c) are fit for the ordinary purposes for which such goods are used; and

> (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
> (e) are adequately contained, packaged, and labeled as the agreement may require; and
> (f) conform to the promises or affirmations of fact made on the container or label if any.
> (3) Unless excluded or modified (Section 2-316) other implied warranties may arise from course of dealing or usage of trade.

*Id.* § 2-314. To recover on a claim for breach of implied warranty of merchantability, a plaintiff must prove: "(1) a sale of goods by a merchant, (2) the goods were not 'merchantable' at the time of sale, (3) injury and damage to the plaintiff or his property proximately caused by the defective nature of the goods, and (4) appropriate notice of breach to the seller." *Collins Radio Co. of Dallas, Tex. v. Bell*, 623 P.2d 1039, 1053 (Okla. Civ. App. 1980). Western Colloid challenges Heartland's proof as to the second and third elements.

### 1.     Privity of Contract

Western Colloid did not raise lack of privity with Heartland as a defense to the breach of implied warranty claim. Nonetheless, the Court confirmed that Oklahoma law permits recovery under § 2-314 despite a plaintiff's failure to purchase the product directly from a defendant. In a case involving defective carpet, the Oklahoma Supreme Court held:

> In the present case there was no direct contract and thus no vertical privity between manufacturer and plaintiff. The code however is silent and strictly neutral as to the necessity of vertical privity in applying implied warranties. It is up to this court to decide to what extent vertical privity of contract will be required. . . . To require vertical privity results in perpetuating a needless chain of actions whereby each buyer must seek redress from his immediate seller until the actual manufacturer is eventually reached. . . . . We hold a manufacturer may be held liable for breach of implied warranty of merchantability or fitness for particular purpose under the Uniform Commercial Code without regard to privity of contract between the manufacturer and the ultimate buyer.

*Old Albany Estates, Ltd. v. Highland Carpet Mills, Inc.*, 604 P.2d 849, 851 (Okla. 1979); *see also Waggoner v. Town & Country Mobile Homes, Inc.*, 808 P.2d 649, 652 (Okla. 1990) ("The ultimate consumer may maintain an action against both the retailer and the manufacturer to recover the

benefit of the bargain."); *Redwine v. Baptist Gen. Convention of State of Okla.*, 681 P.2d 1121, 1123 (Okla. Civ. App. 1982) (explaining that "the ultimate purchaser of defective goods is entitled to recover from the manufacturer for breach of an implied warranty of merchantability regardless of lack of between it and the manufacturer" and that the "ultimate purchaser is properly within the ambit of chain of sale and is entitled, as a matter of policy, to Code protection"). Accordingly, Western Colloid may be held liable for breach of § 2-314 despite its lack of privity with Heartland.

### 2.     Merchantability/Causation

Heartland contends the product -- specifically, the primer -- was not fit for its ordinary purpose and caused visible bubbling on surfaces. Western Colloid argues that Heartland "failed to produce any admissible evidence regarding the alleged product defect it claims caused the damage" and that "Heartland has not provided any expert investigation or testimony as to why the product bubbled or melted and cannot show it was not the result of incorrect tinting or a failure in the application." (Mot. for Summ. J. 9.) The parties' arguments as to merchantability/causation require analysis of what type of evidence is being proffered by Heartland, whether that evidence will be admitted at trial, and whether that evidence is sufficient to create a question of fact.

#### a.     Opinion Testimony of Williamson/Thomison

Williamson and Thomison are not retained experts. The majority of their testimony is factual, lay-witness testimony. However, in their depositions, both witnesses offered their opinion that the primer caused the bubbling. This implicates Federal Rule of Evidence 701 governing opinion testimony by lay witnesses:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
> (a) rationally based on the witness's perception;
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

11

Fed. R. Evid. 701.[3]  If their opinions are based on scientific, technical, or other specialized knowledge, they are expert opinions subject to Federal Rule of Evidence 702 and the disclosure requirements of Federal Rule of Civil Procedure 26(a)(2).  While a non-retained expert need not provide a written report, he must provide the subject matter of his testimony and a summary of the facts and opinions he will provide.  *See* Fed R. Civ. P. 26(a)(2)(C).

The Court has read these two witnesses' depositions in their entirety and concludes that their opinions are not based on scientific, technical, or other specialized knowledge.  They formed their opinions based on personal observation of facts that a jury is capable of understanding without technical or specialized knowledge. These facts include, *inter alia*,: (1) the allegedly unmerchantable primer looked different than the ICC primer that Williamson and Thomison had used previously; (2) the allegedly unmerchantable primer looked different than the "good" buckets of Western Colloid primer; (3) the only difference between two similarly situated houses, where one had bubbling and one did not, was that Thomison used Western Colloid primer on one and ICC primer on the other; and (4) the problems ceased once Pro-Tek switched back to Nationwide as its manufacturer.  Neither witness held himself out to be an expert in the scientific properties of the primer or attempted to offer a technical explanation of the product defect.  Their opinions are based

---

[3] This rule was amended to part (c) in 2000.  The Advisory Committee notes provide that the 2000 amendment was intended to distinguish between types of testimony (expert or not) rather than types of witnesses (expert or not):

> The amendment does not distinguish between expert and lay witnesses, but rather between expert and lay testimony. Certainly it is possible for the same witness to provide both lay and expert testimony in a single case. . . . The amendment makes clear that any part of a witness' testimony that is based upon scientific, technical, or other specialized knowledge within the scope of Rule 702 [expert opinion testimony] is governed by the standards of Rule 702 and the corresponding disclosure requirements of the Civil and Criminal Rules.

Fed. R. Evid. 701 adv. comm. notes to the 2000 amendments.

on personal observations that lay jurors can understand, not on technical or specialized knowledge regarding the specific product in question. In fact, their testimony will be that only through trial and error were they able to deduce what particular product and/or process was causing the bubbling.

If and to the extent Williamson and Thomison plan to offer opinions based on scientific or specialized knowledge as to the properties of the defective primer or other more technical aspects of the priming/coating processes, they are precluded from doing so. Heartland failed to timely identify them as expert witnesses as required by Federal Rule of Civil Procedure 26(a)(2)(A) and failed to provide a summary of their testimony as required by Rule 26(a)(2)(C). Western Colloid was prejudiced because it could not test any "expert" opinions under Rule 702's requirements. Accordingly, Williamson and Thomison are precluded from offering expert opinions, *see* Fed. R. Civ. P. 37(c), and are limited to offering lay witness opinions rationally based on their perceptions.

### b.     Sufficiency of Evidence

Western Colloid argues that, without expert testimony, Heartland cannot satisfy its burden of proving breach and/or causation. (Mot. for Summ. J. 6-7.) Western Colloid relies upon manufacturers' product liability cases for this proposition. (*See id.*) However, manufacturers' product liability is a separate and distinct claim from breach of implied warranty cases arising under the OUCC. *See Waggoner*, 808 P.2d at 652 (explaining that manufacturers' product liability is "primarily tortious in nature" and is "independent of UCC warranty provisions because recovery under manufacturers' product liability arises from a duty to the public rather than from a contractual relationship"). Therefore, even assuming this is a correct statement of law in the manufacturers' product liability context, it is necessary to analyze the question in the specific context of a breach of implied warranty claim arising under the OUCC.

First, the Court concludes there is no strict rule requiring expert testimony to prove breach of an implied warranty of merchantability. *See Lucas v. Firestone Tire & Rubber* Co., 458 F.2d 495,

497 (5th Cir. 1972) ("There is no burden on plaintiff to prove a specific defect by an expert witness as distinguished from other proof. The fact of a malfunction and also of a defect may be proven by direct or circumstantial evidence."). The general rule is that "[i]f the matter in issue is one within the knowledge of experts only and not within the common knowledge of laymen, it is necessary for the plaintiff to introduce expert testimony in order to establish a prima facie case." *Reybold Grp., Inc. v. Chemprobe Techs., Inc.*, 721 A.2d 1267, 1270 (Del. 1998). "For circumstantial evidence to substantiate a prima facie case that there was a breach of the implied warranty of merchantability, it must tend to negate other reasonable causes of the injury sustained or there must be expert opinion that the product was defective." *Id.*

Second, the Court concludes that the "matter in issue" -- namely, whether the primer was not fit for its ordinary purpose and therefore caused the bubbling -- is within the common knowledge of laymen and can be proven by circumstantial evidence. In this particular case, Plaintiff's proposed evidence consists of visible characteristics of the primer, experience with the allegedly defective primers and other primers, and timing of when the problems abated. This evidence is of a type that jurors can understand. In a somewhat similar case, the issue was whether "paint and paint equipment produced mixed paint that matched the samples," as had been warranted. *BASF Corp. v. Sublime Restorations, Inc.*, 880 F. Supp. 2d 205, 218 (D. Mass. 2012). The court reasoned:

> Certainly, many decisions have required expert testimony to establish a product defect. The particular circumstances and the ultimate question of this case (whether plaintiff's paint and paint equipment produced mixed paint that matched the samples), however, fall within the common knowledge of a reasonable juror and thus can be decided without the opinion of a designated expert. In addition, a genuine dispute of material fact remains as to whether the "paint and paint mixing equipment provided by [plaintiff] failed to produce paint colors which matched the sample colors which they were supposed to match." Miller's lay testimony, based on his personal experience, including the description of the process of his paint selection, mixing and application, however, will still prove helpful in assisting a jury to determine whether or not the paint and paint mixing equipment failed to produce paint that matched the sample colors. An ordinary consumer with reasonable expectations would expect the paint and paint mixing equipment to match the paint

> samples. Furthermore, a juror, based on his or her common knowledge, can decide whether the mixed paint matched the sample indicators. The frequency of the failure and, in turn, the existence of a material breach of the implied warranty of merchantability likewise presents a genuine issue of material fact for the jury.

*Id.* (internal citations omitted). Similarly, the Court finds that the "particular circumstances and the ultimate question" (whether use of Western Colloid's primer resulted in visible bubbling on homes) fall within the common knowledge of a reasonable juror and can be demonstrated by circumstantial evidence without the benefit of expert testimony regarding the precise chemical or scientific "defect" in the primer.

Finally, the evidence is sufficient to create genuine disputes of fact on the issues of merchantability and causation. Heartland has produced the testimony of Williamson and Thomison regarding their observations of the allegedly defective primer and their opinion based on their personal observations that the primer -- rather than something else -- caused the bubbling. Although Western Colloid argues that Heartland's straining of the primer, tinting of the ceramic coating, and/or faulty application caused the bubbling and that its primer was fit for ordinary use, these are questions for a jury.

### D.     Punitive Damages

Western Colloid moves for summary judgment on any potential claim for punitive damages. The FAC does not mention punitive damages, and Heartland did not respond to Western Colloid's argument regarding punitive damages. Further, in its response to Defendant's First Motion in Limine, Heartland confessed the motion in limine as to mention of punitive damages. (Doc. 50, ¶ 2.) Accordingly, Heartland does not seek punitive damages, and this aspect of the motion shall be denied as moot.

15

**III.    Motions in Limine**

Defendant filed two separate motions in limine (Docs. 44, 59). In the first, Western Colloid seeks exclusion of the following evidence: (1) existence of liability insurance; (2) any expert testimony by Williamson based on his lack of qualifications; (3) prior claims or lawsuits; and (4) punitive damages. (Doc. 44.) In the second, Western Colloid seeks exclusion of: (1) any expert testimony by Williamson or Thomison based on Heartland's failure to comply with Rule 26(a)(2)'s disclosure requirements;[4] and (2) evidence of lost profits. (Doc. 59.)

Heartland does not intend to offer evidence of liability insurance or punitive damages. Thus, the first and fourth requests of the first motion in limine are denied as moot. The Court has determined, for reasons explained above, that neither Williamson nor Thomison may offer expert opinion testimony. Thus, the motions in limine related to expert testimony are granted. The Court will rule on the remaining two aspects of the motions in limine -- namely, prior claims or lawsuits and lost profits -- at the pretrial conference.

**III.    Conclusion**

The Motion for Summary Judgment of Defendant Western Colloid N.C., Inc. (Doc. 41) is GRANTED in part and DENIED in part. It is GRANTED as to Heartland's claims for breach of express warranty and breach of implied warranty for fitness for a particular purpose and any potential claim for punitive damages. It is DENIED as to Heartland's claim for breach of the implied warranty of merchantability.

---

[4] The heading of this argument is mislabeled as seeking exclusion of the existence of liability insurance, but the substance addresses expert testimony.

Western Colloid's motions in limine (Docs. 44, 59) are granted in part, denied in part, and under advisement in part as follows:

<u>Doc. 44</u>
1. Denied as moot.
2. Granted.
3. Under advisement.
4. Denied as moot.

<u>Doc. 59</u>
1. Granted.
2. Under advisement.

**Dated this 30th day of September, 2016.**

*[signature: Terence Kern]*
**TERENCE KERN**
**United States District Judge**